ESSEX COUNTY ORPHANS COURT.

In the matter of the estate of CHARLES A. WEST, deceased.

**Administration—Letters Granted to Widow of Deceased—Order Appealed From on Ground That She Had Not Been Legally Divorced From a Former Husband—Court Cannot Question Validity Nevada Divorce Decree.**

On appeal from grant of administration by surrogate.

*Messrs. Guggenheimer, Strasser & Meyer* (by *Mr. Charles H. Meyer*), proctors for the appellants; *Messrs. Heine, Bostwick & Bradner* (by *Mr. Palmer Bradner*), of counsel.

*Messrs. Murphy & Fultz* (by *Mr. Frederick W. Murphy*), proctors for the respondent; *Messrs. Whiting & Moore* (by *Mr. Ira C. Moore*), of counsel.

KOCHER, ADVISORY MASTER.

On the 13th day of December, 1922, one Grace F. West, claiming to be the widow of Charles A. West, late of the county of Essex, deceased, made application to the surrogate of the said county for letters of administration upon the estate of the said Charles A. West, deceased, and the said surrogate, by his order made on the day above mentioned, issued letters of administration upon the said estate to the said Grace F. West.

On the 2d day of January, 1923, Arthur H. West, Edgar A. West and Anna G. West, next of kin and heirs-at-law of the said Charles A. West, deceased, filed their petition appealing from the aforesaid order of the surrogate granting letters of administration to the said Grace F. West, and alleging as grounds of appeal that the said Grace F. West was not the lawful wife of the said Charles A. West, deceased, and that no notice of the application for letters of administration was served upon the said appellants, the

heirs-at-law and next of kin of the said Charles A. West, deceased, and that the letters of administration so granted were for that reason null and void.

There is no question that Grace F. West was ceremonially married to Charles A. West. The contention of the appellants is, however, that at the time she was so married, she had another husband living, by reason of the fact that a divorce obtained by her from her prior husband in Reno, Nevada, was invalid. The sole question raised for determination by the appeal is, therefore, whether the Reno divorce is valid.

The uncontroverted testimony as to the facts and circumstances leading up to the Nevada divorce decree are as follows:

The respondent, whose maiden name was Grace M. Flint, lived in the city of Troy, in the State of New York, for the grater part of her life and until about the year 1905, when she removed to the city of New York, where she obtained employment as a private secretary. Thereafter, she continued to reside in New York City, and on June 3d, 1914, was there married to one John Paul Marquette, with whom she continued to live in New York City until some time in the fall of 1916. At this time Mr. Marquette left New York City and went to Montana to practice law, the respondent continuing to reside in New York, and continuing in her employment, which had not been interrupted by her marriage. In 1918, Mr. Marquette returned to New York City to enter the United States army. While in the army he was sent to San Antonio, Texas. The respondent joined him there for a short time, and then returned to New York City and resumed her employment. Some time in August, 1919, the respondent told her employer that she was ill and would have to go away for a short time, and left his employ. On August 26th, or August 27th, the respondent testifies, she arrived in Reno, Nevada, and took up her residence at the Riverside Hotel in that city. On January 5th, 1920, she entered the University of Nevada at Reno, and took two courses in French, two in English literature and three in

history. Her class status was "special." These courses would have been completed in June, 1920, but, as appears hereinafter, the respondent never completed them. Respondent had no employment at Reno, and used, she says, her own money to support herself while there.

On February 28th, 1920, six months and one day, or six months and two days, from the time that the respondent states she arrived in Reno, she filed her petition for divorce in the Nevada courts, alleging that her husband had willfully and without cause deserted and abandoned her, against her will and without her consent, and that he wholly failed to provide for her the common necessities of life.

Mr. Marquette, the husband, was at this time in a hospital at Washington, District of Columbia; he never was in the State of Nevada at any time. The record of the divorce proceedings in Nevada shows that on the 11th day of February, 1920, the said John Paul Marquette executed a power of attorney authorizing H. F. Danforth, an attorney of the city of Reno, to represent him in any action "now commenced, or hereafter to be commenced, against me by Grace F. Marquette in the second judicial district court of the State of Nevada;" that an answer in the divorce proceedings was filed by Mr. Danforth for Mr. Marquette, in which he denied all of the allegations of the petition, and that due service of this answer was admitted on February 28th, 1920, by Stoddard & Salisbury, attorneys for respondent, the petitioner in the divorce proceedings. It may be noticed, in passing, that the husband's power of attorney was executed seventeen days before the wife's petition for divorce was filed and that the answer was served on the same day on which the petition was filed. The record of the Nevada court further shows that on March 5th, 1920, a decree of divorce was granted to the appellee.

Mrs. West's explanation of her trip to Reno is that, just before leaving New York City, she was in poor health, out of sorts and very discouraged; that she intended to go to California to recuperate; that she purchased a ticket for California, and that on the train she met some people who

lived at Reno, Nevada. These acquaintances, learning of her ill health and of her intention of going to California, told her of the wonderful climate of Nevada, and also of the fact that there was a wonderful state university in Reno, where respondent could attend, her acquaintances knowing that she wished to perfect herself in certain studies. She left the train at Reno and went to the Riverside Hotel. When she got off the train she did not have it in mind that she might get a divorce from her husband, although she had thought of it before that time. She entered the state university, and at that time intended to remain permanently in Reno, and intended to stay at the hotel only until she could secure a small apartment. She did not conclude her course at the university, because she was taken very ill in January, 1920, with influenza and nervousness, and her doctor advised her to remove from Reno. She did so, intending to go to Southern California for a rest, and then to return to Reno and finish her course at the university, but when she reached Los Angeles, she received word that her mother, who resided at Troy, New York, was very ill, and wanted respondent to return and see her. She, thereupon, and after having been in California for about a week, went to Troy and visited her mother, arriving in the early part of April, 1920. Her mother recovered from her illness.

The further testified that she met Mr. West, the intestate, with whom she had been acquainted for some time previously, at her mother's house in Troy, on April 16th, 1920, and it is undisputed that she married him in New York City of April 27th, 1920. The respondent's testimony that, at the time of her leaving New York City, she intended to go to California, is corroborated by the testimony of one Helen J. Twony, who testifies to statements to that effect made to her by the respondent at that time. It should be noted, in passing, that objection was made to the admission of the witness Twony's testimony as to those declarations made to her by the appellee, which testimony was tentatively admitted.

34

Mr. Marquette, called as a witness on behalf of the respondent, testified· that his first knowledge of the contemplated divorce proceedings was obtained through a letter from his wife, sent from Reno, Nevada, and received by him about October 15th, 1919,· and that the substance of this letter was that she was taking a course at the university in Reno, and had decided she was· going to get a divorce. The copy of the record of the university, admitted in evidence, shows that respondent entered the university on January 5th, 1920, as has already been stated. He says that he replied to this letter, the substance of his reply being that she was doing a foolish thing, but that he was helpless in the matter, and that if she was determined to have a divorce there was nothing he could do. He received no further letter from his wife. Some time thereafter he received a letter from a· firm of attorneys in Reno, "Stoddard and somebody, I think the name was; I do not recall the name." This letter stated that they either had filed, or were about to file, a suit for divorce as attorneys for his wife, and notified him that he had the right to appear in that suit if he so desired, stating that the charge made by ·attorneys in Reno for appearance was $25, and enclosing a list of names of attorneys at Reno, about six in number. The letter further stated that if he chose to appear in the suit, he could select an attorney to do so. A power of attorney was enclosed. As has been stated, Mr. Marquette was at this time confined to a hospital in Washington.

He further testifies that he selected the name of Mr. Danforth from the list of attorneys submitted, his reason for selecting him being that he was city attorney, and that he thought he was probably a reliable man. He sent an orderly from the hospital to the post office to get a money order payable to Mr. Danforth, presumably for $25, executed the power of attorney, and returned the letter he had received to the firm of attorneys from whom he had received it, with a memorandum endorsed thereon, and· enclosing· the money order and the executed power of attorney. He says,· further, that he was at this time in bed in the hospital, with a plaster

cast from his arms down to his feet. He felt he was helpless, and did not desire to contest the suit, but wished to appear in it to make sure that the court had jurisdiction over him, because, in his own language, "if I was to be divorced, I wanted to be divorced, and not running around not knowing whether I was divorced or not."

Mr. Marquette denied that he had received any money from his wife to induce him to appear in the Nevada divorce suit; he stated, however, that he had received money from his wife at an earlier rate as a loan to enable him to open an office in Montana, but that he had repaid this money to his wife some time in the early summer of 1919 and before the institution of the divorce proceedings.

It appears from the testimony that, after the granting of the Nevada divorce decree, Mr. Marquette remarried, and that he does not reside, and never has resided, in the State of New Jersey.

Upon the foregoing statement of facts, and giving the respondent the benefit of the testimony of the witness Twony, I should have no difficulty in finding that the Nevada divorce was obtained by fraud and imposition upon the court granting it by reason of the obviously fictitious nature of the respondent's residence in that state. The respondent, however, contends, *in limine,* that this court should not pass upon the validity of the Nevada divorce, upon the ground that, as appears by the undisputed testimony, neither the respondent nor her then husband, Mr. Marquette, were residents of New Jersey at the time of the granting of the Nevada divorce, or at any time prior thereto.

There appears to be two reported cases in this state dealing with this situation. In *Nichols* v. *Nichols, 25 N. J. Eq.* 60, decided by Chancellor Runyon in 1874, the complainant, in 1872, filed her bill in the court of chancery against the defendant, praying a divorce *a vincule.* Complainant and defendant were married in Massachusetts in 1852, and resided in Plainfield, New Jersey, until 1868, when they broke up housekeeping, stored their furniture, and went, with their children, to the residence of defendant's father in

Massachusetts.   The defendant, after remaining in Massa-chusetts for about a week, returned to New Jersey to settle up his business, and remained about a month, engaged in collecting debts and in packing up his goods to remove them. He then went west, and was in Indiana in March, 1868, claiming to have taken up his residence there.   About April 1st, 1868, he came east from Indiana for the purpose of collecting some debts, but, he alleged, with the intention of returning again to Indiana.   From that time until about July 1st he appeared to have no particular abiding place, but he did not return to Plainfield, nor did he again come to this state to reside.   About July 1st, 1868, he settled in Brooklyn, New York, and was still residing there at the time of the filing of complainant's bill.   Complainant remained in Massachusetts until some time in July, 1868, when she returned to Plainfield, the former place of residence of her husband and herself, and remained there thereafter to the time of the filing of her bill.   Her bill of complaint alleged that for the ten years next preceding its filing she had been, and was, when the bill of complaint was filed, a resident of Plainfield, and that the defendant was also a resident of that place until January, 1868.

The defendant answered, alleging that he had been divorced from the complainant by a decree rendered June 27th, 1868, in a suit brought by him in the Indiana courts, wherein the complainant had appeared and answered.   The complainant replied that this decree of divorce had been fraudulently obtained; that the Indiana court never acquired jurisdiction over the parties to or the subject-matter of the proceedings, nor over their marriage relation, and that the parties had been from 1862 up to, and were at the time of those proceedings, residents of this state; that the complainant had not appeared in person or by attorney in the Indiana court, had never knowingly signed any warrant of attorney as alleged by the defendant, and had never known or heard of the proceedings until after the decree was obtained, and that the proceedings and the decree were fraudulent and void.

The court of chancery found that, when complainant and defendant removed from Plainfield, he left New Jersey intending to change his domicile, and did remove his domicile from this state; that when the proceedings for divorce were instituted in Indiana, and until their conclusion, he was, if not a resident of that state, a resident of Massachusetts, and that neither he nor the complainant at that time resided in New Jersey. The court also found that the wife had actual notice of the Indiana suit, and that she had appeared and answered by her attorney duly appointed, and that it appeared, by the record in that suit, that the question of domicile had been passed upon and the petitioner therein adjudged to have been, at the time of the filing of the petition, a *bona fide* resident of Indiana, and to have been such for a year previous thereto.

On these facts the court of chancery held that the decree was conclusive in Indiana, and was so here also; that it was unnecessary to express an opinion on the question whether the decree was conclusive on the subject of the domicile of the petitioner, as against a charge that the petitioner had not in fact been a *bona fide* resident of Indiana for a year previous to filing the petition, and that, therefore, the proceedings and decree of divorce were a fraud upon the complainant and upon the laws of this state, because, if that were so, and the fraud admitted, the complainant was a party to it, and could not take advantage of it, and that the parties to a collusive divorce were bound by it.

After making these findings, the court used the following language:

"There is still another consideration. I am satisfied from the evidence that the parties to this suit were not residents of this state when the suit in Indiana was commenced, nor at any time during its progress, nor at the time when the decree was made. No fraud on the law of this state, therefore, was committed by those proceedings or that decree."

As a third ground of decision, the court also found that the complainant was guilty of laches, the defendant having remarried shortly after obtaining the Indiana divorce, and

## 534    NEW JERSEY MISCELLANEOUS REPORTS.

having had children by this marriage, and the complainant having waited for four years after the Indiana divorce decree was made, and over two years after her husband had contracted the second marriage, before filing her bill, without any reason or excuse being given or appearing for the delay.

Appellants point out that *Nichols* v. *Nichols, supra,* was criticised in the later case of *Watkinson* v. *Watkinson, 67 N. J. Eq. 142, 158,* in which latter case it was doubted "whether such ruling will stand the test of more modern cases." The ruling referred to, however, was that part of the opinion in the *Nichols Case* holding that the divorce decree was valid, although collusive, and not that concerning the residence of the parties which has been quoted above.

Respondent, in turn, points out that *Watkinson* v. *Watkinson, supra,* was, in turn, reversed in *68 N. J. Eq. 632,* but this reversal was upon the facts as found by the court of chancery, and did not criticise the statement of law just quoted.

Respondent also point out that *Nichols* v. *Nichols, supra,* was cited with approval by the court of errors and appeals in *Fairchild* v. *Fairchild, 53 N. J. Eq. 678, 680,* but this also was not upon the fact that the parties to the Indiana divorce were not residents of New Jersey at the time, but upon the ruling stated in *Nichols* v. *Nichols, supra,* that the decision of the foreign state as to the *bona fides* of the complainant's residence therein, unless procured by fraud, is conclusive, not only in the foreign state, but in every other jurisdiction where the validity of the judgment comes in question.

The other New Jersey case, which appears to be in point on this question, is *Lister* v. *Lister, 86 N. J. Eq. 30,* decided in 1916. In this case, Vice-Chancellor Stevenson, in holding void a divorce obtained by the defendant from the complainant in the State of Nevada before the filing of the bill of complaint in the court of chancery, used the following language:

"It is, I think, the established law of this state, that jurisdiction of a court to grant a divorce from the bond of matrimony cannot rest, in the slightest degree, upon the consent of either of the parties to the marriage, or of both of them. Any divorce granted by a court in a foreign state in which neither of the parties was a *bona fide* resident would, I think, be treated as void by the courts of New Jersey, even although neither of the parties was at any time a resident of this state. Of course, it is not necessary to lay down such an extreme proposition in this case, because the complainant was domiciled in New Jersey, the matrimonial domicile was here, and the defendant's pretended change of domicile and residence was a fraud and a sham."

It thus appears that this language employed by Vice-Chancellor Stevenson is pure *dictum*, the parties in that case both having been residents of New Jersey.

On the other hand, the doctrine in *Nichols* v. *Nichols, supra,* that the fact that the parties to the divorce suit in the foreign state were not residents of this state at any time during the progress of such suit, nor at the time when the decree was made, prevents such proceedings from being a fraud on the laws of this state, and that, consequently, such decree cannot be successfully attacked in the courts of this state, while, as has been stated, only one of three grounds for the decision in that case, nevertheless, is a *ratio decidendi* in that case, and, as such, a ruling of the court of chancery.

In addition to the cases above considered, appellants cite *Thompson* v. *Thompson, 89 N. J. Eq. 70,* and *Garabrant* v. *Garabrant, 1 N. J. Adv. R. 1507.*

In *Thompson* v. *Thompson, supra,* it was held that under section 33 of the Divorce act (*2 Comp. Stat. p. 2041 § 33*) a foreign divorce decree is not entitled to enforcement on the ground of interstate comity, where jurisdiction has been acquired by substituted service, unless, in accordance with section 7 of the Divorce act (*2 Comp. Stat. p. 2032 § 7*), the petitioner, except where the divorce is sought on the ground of adultery, was a *bona fide* resident of the state in which

the divorce was granted for two years next preceding the commencement of the suit. It will be noted, however, that this decision expressly applies only to a case of substituted service, whereas, in the case at bar, the defendant appeared and answered in the Nevada court. In the *Thompson Case*, furthermore, it is, by necessary implication, held (at *p. 73*), that if defendant has appeared in the divorce suit in the foreign state, the decree is entitled to recognition under the full faith and credit clause of the United States constitution, and the doctrine of interstate comity need not, in such a case, be invoked. In *Garabrant* v. *Garabrant, supra*, the defendant also did not appear in the divorce suit in the foreign state, and the doctrine of *Thompson* v. *Thompson* was, consequently, applied.

Respondent has called attention to the case of *Floyd* v. *Floyd, 2 N. J. Adv. R. 638*, decided by the court of errors and appeals in April, 1924. This case was a direct attack by the complainant, in the court of chancery, on a divorce decree obtained against him by the defendant in the State of Nevada and alleged to have been fraudulently procured by her. The complainant and defendant were married in Virginia, and resided either there or in Pennsylvania up to the time the defendant, on January 9th, 1921, left her husband and went to Nevada, where, on September 3d, 1921, she filed her petition for divorce. On October 24th, 1921, the defendant, as petitioner in the Nevada courts, was granted a decree of divorce, and immediately thereafter returned east and took up her residence at Atlantic City, in this state, where she still resides. The complainant, continuing to be, or having become, a resident of Pennsylvania, and never having become a resident of the State of New Jersey, thereupon filed his bill of complaint in our court of chancery, seeking to have the Nevada decree declared void.

The court of chancery granted complainant the relief sought; but the decree was reversed by the court of errors and appeals on the ground that complainant had no legal status in this state to maintain his suit, for the reason that

the matrimonial domicile of the parties was in the State of Pennsylvania; that reliance for the successful prosecution of the suit was based upon the simple fact that the defendant was residing in Atlantic City, and was served with process there, and that, in leaving her husband and going to the State of Nevada and petitioning for divorce there, under the circumstances narrated in the bill, she perpetrated a fraud upon the complainant and the courts of this state, and that, although the present suit did not seek a dissolution or annulment of the marriage contract, nevertheless, it is quite manifest, whatever result the court below reached, it would affect the marital relation, which never was here, but existed in the State of Pennsylvania at the time the defendant obtained her decree.

The fact that this case was a direct attack upon a foreign divorce decree renders its decision inapplicable to the case at bar, which is one of collateral attack. Indeed, this fact is emphasized by the following language used by the court of errors and appeals in its opinion:

"We are only concerned in passing upon the validity of a judgment of a sister state where an attempt is made to enforce such judgment in this state. and when the validity of such judgment is attacked upon the ground of fraud or want of jurisdiction of the foreign forum over the subject-matter or of the person. * * * There can be no debatable question concerning the right of a suitor to come into this state and attempt to enforce a judgment obtained in a foreign state, and likewise the right of a defendant to challenge the validity of such judgment upon the ground of fraud or lack of jurisdiction of the foreign tribunal which rendered the judgment."

This language is so sweeping as, by implication, to cast some doubt upon the doctrine of *Nichols* v. *Nichols, supra;* but, sweeping as it is, it is, after all, pure *dictum,* and I cannot consider it as of any controlling effect.

Both parties also cite, in support of their respective contentions, the case of *Andrews* v. *Andrews, 188 U. S. 14,* de-

cided by the supreme court of the United States in 1903 This case concerns an attack upon a Massachusetts statute, similar to section 33 of our Divorce act (*2 Comp. Stat. p. 2041 § 33*), providing that a divorce decreed in another state, by a court having jurisdiction of the cause and of both the parties, should be valid in Massachusetts, but that if an inhabitant of Massachusetts should go into another state to obtain a divorce for a cause which occurred in Massachusetts while the parties resided in Massachusetts, or for a cause which would not authorize a divorce under the laws of Massachusetts, such divorce should be of no force or effect in Massachusetts. The contention was made that the statute conflicted with the full faith and credit clause of the constitution of the United States, and the supreme court said (at *p. 29*):

"In coming to the solution of this question, it is essential, we repeat, to bear always in mind that the prohibitions of the statute are directed solely to citizens of Massachusetts domiciled therein, and that it only forbids the enforcement in Massachusetts of a divorce obtained in another state by a citizen of Massachusetts, who, in fraud of the laws of the State of Massachusetts, while retaining his domicile, goes into another state for the purpose of there procuring a decree of divorce."

It will thus be perceived that this case does not help appellants, because, while it held the statute in question valid, the parties concerned were residents of the State of Massachusetts, while in the case at bar, as has been seen, the parties were not residents of New Jersey; and further, because the ground of attack on the foreign decree in that case was that the divorce had been procured for a cause which accrued in the State of Massachusetts, or which was not a cause for divorce in Massachusetts, while in the case at bar the attack is upon the *bona fides* of the petitioner's residence in the foreign state. Nor is the case of help to the respondent, because, while the deduction might be drawn from the language cited that, if the statute had directed its prohibition against others than citizens of Massachusetts domiciled therein, the

supreme court would have found it to be uncontitutional, such deduction is a mere supposition, not even rising to the dignity of *dictum,* and, in point of fact, I have not been referred to any federal case, and do not know of any, adjudicating upon such a statute.

The result of the foregoing is that the decision of the court of chancery on this point in *Nichols* v. *Nichols, supra,* still stands unreversed and unassailed by any other decision of our courts, and unquestioned except by *dictum,* and is binding on this court, and I am therefore constrained to hold that this court cannot, under the facts in this case, pass upon the validity of the Nevada divorce decree obtained by the respondent.

I will therefore advise a decree dismissing the appeal.